JAMES HOLL (CA Bar No. 177885)
jholl@cftc.gov
COMMODITY FUTURES TRADING COMMISSION
1155 21st Street, N.W.
Washington, DC 20581
(202) 418-5311 / (202) 818-3117 (fax)

LOCAL COUNSEL:
DANIELLE A. STOUMBOS (CA Bar No. 264784)
Danielle.Stoumbos@dfpi.ca.gov
DENISE SMITH (CA Bar No. 309225)
Denise.Smith@dfpi.ca.gov
CALIFORNIA DEPARTMENT
OF FINANCIAL PROTECTION & INNOVATION
320 West Fourth Street, Suite 750
Los Angeles, California 90013
(213) 503-2046 / (213) 576-7181 (fax)

## THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION and CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION & INNOVATION, <br><br> Plaintiffs, <br><br> v. <br><br> REGAL ASSETS LLC, TYLER G. GALLAGHER, and LEAH DONOSO, <br><br> Defendants. | Civil Action No. 2:23-cv-8078 <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION AND OTHER EQUITABLE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Plaintiffs Commodity Futures Trading Commission ("CFTC" or "Commission") and California Department of Financial Protection & Innovation ("DFPI"), by and through their undersigned attorneys, hereby allege as follows:

## I.   SUMMARY

1.     Beginning in at least November 2019 and continuing through at least October 2022 ("Relevant Period"), Regal Assets LLC ("Regal Assets"), Tyler G. Gallagher ("Gallagher"), and Leah Donoso ("Donoso") (collectively "Defendants"), engaged in a scheme to defraud people throughout the United States, including in this District and elsewhere in California, in connection with the purchase and sale of precious metals.

2.     During the Relevant Period, Regal Assets solicited customers to transfer funds in their tax-deferred retirement accounts, including individual retirement accounts ("IRAs"), 401(k) plans, and/or the U.S. Government Thrift Savings Plan ("TSP"), to purchase precious metals from Regal Assets through self-directed IRAs ("SDIRAs").  Regal Assets also solicited and accepted funds from customers to purchase precious metals using non-retirement funds.

3.     Rather than use all of the customers' funds for their intended purpose, Defendants misappropriated more than $21 million of the funds provided by more than 120 customers.

4.     In doing so, Defendants made knowing or reckless fraudulent misrepresentations and omissions to customers in order to conceal their misappropriation and maintain their fraudulent scheme.

5.     By virtue of this conduct, and as more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in, violations of:  Section 6(c)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022), and Section 29536 of the California Corporations Code.

6.     The acts, misrepresentations, omissions, and failures of Gallagher, Donoso, and other officers, employees, and agents of Regal Assets occurred within the scope of their employment, agency, or office with Regal Assets.  Therefore, Regal Assets is liable for all of these acts and practices pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2022).

7.     During the Relevant Period, Gallagher served as Regal Assets' CEO, owner, and principal.  In these roles, Gallagher controlled Regal Assets, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Regal Assets' conduct alleged in this Complaint.  Therefore, Gallagher is liable for the acts of Regal Assets described herein pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b).

8.     Accordingly, pursuant to Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§ 13a-1, 13a-2(1), the CFTC and the DFPI bring this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the CEA and CFTC Regulations, and to enjoin them from engaging in any commodity-related activity, as set forth below.  The DFPI separately alleges violations of state law based on the conduct described herein.  Plaintiffs also seek civil monetary penalties, restitution, and remedial ancillary relief, including but not limited to, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is

1  engaging, or is about to engage in any act or practice constituting a violation of any
2  provision of the CEA or any rule, regulation, or order thereunder.

3       10.     Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1), authorizes the DFPI to
4  bring a suit in the district courts of the United States to seek injunctive and other
5  relief against any person whenever it appears to the Attorney General and/or
6  Securities Administrator of a State, or such other official that a State may designate,
7  that the interests of the residents of the State have been, are being, or may be
8  threatened or adversely affected because of violations of the CEA or CFTC
9  Regulations.  The acts and omissions in violation of the CEA and CFTC regulations
10  occurred within California and throughout the United States.  Customers from
11  California were materially and substantially harmed by Defendants' violations of the
12  CEA, CFTC Regulations, and various provisions of California state law.

13       11.     This Court has supplemental and pendant jurisdiction over California
14  state law claims of the DFPI pursuant to 28 U.S.C. § 1367(a).

15       12.     Venue lies properly in this District pursuant to Section 6c(e) of the CEA,
16  7 U.S.C. § 13a-1(e), because one of Regal Assets' primary offices was located in this
17  District, Defendants transacted business in this District, Gallagher resided in this
18  District, and certain transactions, acts, practices, and courses of business in violation
19  of the CEA, CFTC Regulations, and the California Corporations Code occurred, are
20  occurring, or are about to occur within this District, among other places.

21                            **III.    PARTIES**

22  **A.    Plaintiffs**

23       13.     **Commodity Futures Trading Commission** is the independent federal
24  regulatory agency charged by Congress with the administration and enforcement of
25  the CEA and CFTC Regulations promulgated thereunder.  The CFTC maintains its
26  principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C.
27  20581.

28

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

14.    **California Department of Financial Protection and Innovation**:

Headed by a Commissioner, the DFPI has jurisdiction over the offer and sale of commodities in California under the California Commodity Law of 1990 ("CCL") (Cal. Corp. Code §§ 29500-29567).  The DFPI maintains its principal office at 2101 Arena Boulevard, Sacramento, California 95834.

**B.    Defendants**

15.    **Regal Assets LLC** was a California limited liability company formed on January 5, 2010, with a registered address of 3450 Cahuenga Boulevard West, Building 705, Los Angeles, California 90068, and a mailing address of 280 South Beverly Drive, 5th Floor, Beverly Hills, CA 90212.  On June 30, 2014, Regal Assets registered as a foreign limited liability company with the Texas Secretary of State, with a business address of 200 West State Highway 6, 4th Floor, Waco, Texas, 76712.  On September 27, 2022, Regal Assets' registered agent resigned.  In or around late 2022, Regal Assets ceased operations.  Regal Assets has never been registered in any capacity with the Commission or the DFPI.

16.    **Tyler G. Gallagher** is Regal Assets' sole Member and CEO.  Gallagher is a signatory on all of Regal Assets' bank accounts.  During the Relevant Period, Gallagher held at least a 90% ownership share in Regal Assets, controlled its operations, supervised (directly and indirectly) its employees and agents, and made hiring and firing decisions on behalf of Regal Assets.  Gallagher has never been registered in any capacity with the Commission or the DFPI.  During the Relevant Period, Gallagher resided at least in part in Los Angeles, California.

17.    **Leah Donoso** was Regal Assets' President during the Relevant Period. Donoso was a signatory on one of Regal Assets' bank accounts and had access to and discretion over Regal Assets' other bank accounts.  During the Relevant Period, Donoso was in charge of many aspects of Regal Assets' daily operations, including the pricing and purchasing of precious metals, initiating bank wire payments, and

payroll.  Donoso also supervised (directly and indirectly) certain Regal Assets' employees and agents.  Donoso has never been registered in any capacity with the Commission or the DFPI.  During the Relevant Period, Donoso resided in Texas.

## IV.    FACTS

### A.    Regal Assets' Precious Metals Business

18.    Regal Assets is a precious metals retailer, meaning it sells various types of precious metals products (e.g., bars, rounds, and coins) directly to members of the public.

19.    Precious metals are commodities under Section 1a(9) of the CEA, 7 U.S.C. § 1a(9).

20.    During the Relevant Period, Regal Assets solicited customers to transfer funds in their tax-deferred retirement accounts and use those funds to purchase precious metals from Regal Assets through SDIRAs.  Regal Assets also solicited and accepted funds from customers to purchase precious metals from Regal Assets using non-retirement funds.

21.    In either case, Defendants controlled and/or facilitated nearly every step of the precious metals transactions with customers.

22.    For customers who decided to use retirement funds to purchase precious metals from Regal Assets, Defendants' normal business practice consisted of multiple steps.

23.    Typically, a Regal Assets agent would provide the prospective customer with information on the process and the benefits of converting their existing retirement holdings to precious metals.

24.    Once the Regal Assets agent and the customer agreed on the terms for the customer's precious metals purchase, the agent would typically email a purchase confirmation to the customer stating, *inter alia*, that Regal Assets had "locked up"

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

and/or "secured" the precious metals for the customer at the agreed-upon price, quantity, and type.

25.     Customers had to open and fund a SDIRA with a SDIRA custodian in order to maintain tax-deferred status for the precious metals that would ultimately fund the SDIRA.

26.     The Regal Assets agent would complete the SDIRA account opening application on behalf of the customer, forward the application and investment authorization form (including a detailed inventory of the precious metals to be purchased) to the customer to sign and return to Regal Assets, and then forward the signed application to the SDIRA custodian.

27.     The SDIRA application included the customer's authorization to: (i) liquidate their existing retirement account holdings; (ii) have the proceeds transferred to their newly opened account at the SDIRA custodian; and (iii) then have the SDIRA custodian transfer the funds to a Regal Assets bank account.  Regal Assets was then to use those funds (minus Regal Assets' fees or commissions) to purchase the customer's precious metals from a wholesaler.

28.     Regal Assets would handle the purchasing of the precious metals to deposit into the customer's SDIRA account.

29.     Customers wanting to maintain the tax-deferred status of their newly opened precious metals SDIRA account could not take personal possession of the precious metals.  Therefore, Regal Assets would instruct the wholesaler to ship the newly-purchased metals to a metals depository to be held under the customer's name and SDIRA account number.

30.     The depository would then provide confirmation to the SDIRA custodian that the precious metals had been placed into the depositary for the benefit of the customer, and the SDIRA custodian would update the customer's SDIRA account to reflect that the metals were located at the depository.

31.     For customers using non-SDIRA funds to purchase precious metals, Regal Assets' normal business practice consisted of first agreeing with the customer on the price, quantity, and type of metals to be purchased and providing the customer a purchase confirmation containing this information.

32.     After receipt of the purchase confirmation, the customer would transfer their funds directly to a Regal Assets bank account.  Regal Assets was supposed to use those funds (minus Regal Assets' fees or commissions) to purchase the customer's precious metals from a wholesaler.

33.     Regal Assets then facilitated the shipment of the precious metals to a location of the customer's choosing, usually a precious metals storage depository or, in some instances, directly to the customer.

34.     In instances where the precious metals were sent to a depository, the depository would assign the metals to an account in the customer's name or to a "sub-account" under a "master" account held in Regal Assets' name.  These sub-accounts were simply ledger entries under Regal Assets' master account which designated the metals allotted to each specific Regal Assets customer.  As the holder of the master account, Regal Assets was the sole party in control of the customers' precious metals holdings designated in the sub-accounts and the only party who received from the depositories periodic holdings statements for the sub-accounts.

**B.     Defendants Misappropriated Customer Funds**

35.     During the Relevant Period, Defendants misappropriated more than $21 million of customer funds from over 120 customers.

36.     These funds consisted of:  (i) at least $21.4 million in customer funds received by Regal Assets intended for the purchase of precious metals which were never bought; and (ii) at least $300,000 in proceeds from Regal Assets' liquidation of precious metals held in the customers' designated sub-accounts at a depository.

37.     The vast majority of the funds Regal Assets misappropriated were from customers' retirement funds in their SDIRA accounts.  Many of these customers were elderly or retired individuals who would have great difficulty trying to rebuild their retirement savings.

38.     By at least November 2019, Defendants' misappropriation of customer funds left Regal Assets with insufficient funds to acquire all of the precious metals it owed to its customers.  Defendants knew this or were reckless in not knowing it when they continued to accept new customers and continued to misappropriate customer funds during the Relevant Period.

39.     Defendants' misappropriation of these funds came in multiple forms, as described below.

### 1.  Defendants Misappropriated Customer Funds For Their Own Personal Use

40.     During the Relevant Period, rather than purchase precious metals for all of their customers, Defendants used customer funds for their own personal use.

41.     For example, Gallagher misappropriated customer funds to pay for personal expenses, such as:

    a.  Over $1 million of payments to several PayPal accounts related to a competitive video-gaming business owned by Gallagher;

    b.  Over $800,000 in monthly mortgage payments on Gallagher's multi-million dollar house in Beverly Hills;

    c.  Approximately $170,000 to settle a lawsuit related to Gallagher's purchase of box seats at a sports arena;

    d.  Over $150,000 of payments to individuals performing personal services for Gallagher such as a driver and housekeeper;

    e.  At least $150,000 in payments to a person believed to be Gallagher's girlfriend at the time;

f.  Approximately $146,000 on an apartment for Gallagher and his girlfriend and/or her brother;

g.  Approximately $73,500 for the purchase of a Cadillac Escalade; and

h.  Approximately $73,400 on a Tesla car payment for Gallagher's girlfriend.

42.  Gallagher often instructed Donoso to make such payments on his behalf.

43.  During the Relevant Period, Defendants directed payments to Donoso for over $300,000 in salary; $65,000 in cash bonuses; thousands of dollars in salary for work related to Gallagher's non-Regal Assets business; and over $100,000 in other direct payments from a Regal Assets bank account.

44.  Defendants also directed payments to Donoso's husband totaling over $454,000 in salary and $15,000 in cash bonuses.

45.  In addition, Donoso received approximately $868,000 worth of precious metals as bonuses for her work as Regal Assets' President.  Upon placing an order using customer funds, Donoso instructed the metals wholesalers to ship the metals directly to her home.  Donoso subsequently sold back those metals to another metals wholesaler and retained the proceeds for her personal use.

46.  Gallagher and Donoso knew or were reckless in not knowing that these payments and bonuses described above were made using customer funds to which they were not entitled and during a time when Regal Assets owed customers a quantity of precious metals the value of which far exceeded Regal Assets' capital in its bank accounts.

47.  For example, in late April 2022, Donoso purchased 35 one-ounce gold bars from a precious metals wholesaler and had them delivered to her house.  She paid the precious metals wholesaler approximately $67,900 from a Regal Assets bank account in early May even though, as of the end of April 2022, Donoso knew or was reckless in not knowing that Regal Assets owed their customers approximately

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

$18 million in precious metals.  Donoso subsequently sold 25 one-ounce gold bars in late June 2022 and received the proceeds of the sale, approximately $45,000, in her personal bank account.

### 2.  Defendants Used New Customer Money to Pay-Off Old Customers

48.     As mentioned above, by at least November 2019, Defendants' misappropriation of customer funds left Regal Assets with insufficient funds to fill their customers' precious metals orders.

49.     Consequently, during the Relevant Period, Defendants—in a Ponzi-like manner—used funds from some new customers to fulfill the orders of or pay back old customers.

50.     For example, at the start of November 2021, Regal Assets owed at least $7 million in precious metals to customers, but only had approximately $347,724 in its bank accounts.  From November 1 through November 16, 2021, Regal Assets received approximately $2.7 million from one of the SDIRA custodians on behalf of five customers.  Instead of using those funds to acquire precious metals for the five customers, Defendants used those funds to, among other things, purchase precious metals for older customers.  The five customers never received their metals.  Only one customer received a refund of less than 20 percent of her funds in the summer of 2022 after repeated demands for a full refund.

51.     As another example, on August 8, 2022, a new customer ("Customer A") transferred $1,135,130 from his SDIRA to Regal Assets for the purpose of purchasing precious metals from Regal Assets.  Prior to this deposit, the combined balance in Regal Assets' bank accounts totaled under $131,000.  The following day, Donoso initiated an $806,000 wire transfer to an old customer ("Customer B"), who previously sent approximately $1.2 million to Regal Assets to purchase precious metals but subsequently demanded a refund because her metals were never delivered.

52.     Defendants repeated this cycle of using funds from new customers to settle the accounts of old customers throughout the Relevant Period.

### 3.  Defendants Misappropriated Customer Funds to Keep Their Fraudulent Scheme Afloat

53.     During the Relevant Period, Defendants used customer funds to which they were not entitled to pay for Regal Assets' business expenses, such as:

a.  At least $4.1 million on payroll including direct payments to Gallagher and Donoso;

b.  At least $1.6 million on Regal Assets credit cards used for both business and personal expenses; and

c.  Approximately $1.1 million on legal fees for Regal Assets and Gallagher personally.

54.     While Defendants were misappropriating customer funds, Gallagher obtained additional capital in the form of secured loans from third parties to keep Regal Assets' Ponzi-like operation afloat.  During the Relevant Period, Regal Assets received approximately $6.4 million in loan proceeds.  Defendants misappropriated customer funds to pay down the balances on these loans.

55.     The misappropriation was executed by Gallagher directly or by Gallagher instructing Donoso to make the aforementioned payments from Regal Assets' bank accounts which held customer funds.  At the time they were making these payments, Gallagher and Donoso knew or were reckless in not knowing that they were using customer funds intended for the purchase of precious metals for the customers.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

**C.     Defendants Made Misrepresentations and Fraudulent Omissions to Customers and SDIRA Custodians in Order to Conceal and Perpetuate Their Fraudulent Scheme**

56.     In addition to misappropriating customer funds (which included the making of Ponzi-like payments as described above), throughout the Relevant Period, Defendants routinely misrepresented to customers that Defendants would acquire or had acquired the customers' precious metals (e.g., telling the customer that their metals were "locked up" and/or "secured") in instances where in fact Regal Assets did not actually acquire the metals.

57.     Gallagher and Donoso knew or should have known that such false representations were being made to customers by other agents of Regal Assets.

58.     Donoso herself made similar misrepresentations directly to customers. For example, in August 2022, in response to multiple emails from a customer ("Customer C") requesting that Donoso confirm the purchase of his precious metals and shipment of same to a depository, Donoso responded that "I emailed [the depository] to check on [the] status of your metals.  It usually takes the [depository] 3 days to respond.  I am waiting on your download update with the [depository]."  In response to a subsequent email from Customer C asking Donoso again to confirm that his metals were purchased in June 2022, Donoso responded that the "[m]etals were purchased the day we locked you in."  At the time Donoso made these statements, Donoso knew that no precious metals had been purchased for Customer C.

59.     Defendants failed to disclose to prospective and existing customers that Defendants were misappropriating customer funds.

60.     Defendants made these fraudulent misrepresentations and omissions (and Ponzi-like payments) in order to conceal and maintain their fraudulent scheme.

61.     At various times during the Relevant Period, customers contacted Regal Assets, including Gallagher and Donoso specifically, to inquire about why the

precious metals they purchased were not showing up in their SDIRA accounts in a timely manner.  On multiple occasions, Gallagher instructed Donoso to give customers information that they each knew, or should have known, was false in response to these and other customer inquiries, which Donoso did.

62.     False information provided by Defendants to customers and at least one SDIRA custodian included:  that the depository was delayed in taking inventory of the precious metals shipments or issuing reports to the SDIRA custodian; that the metals were sitting in a truck at the depository; that the SDIRA custodian did not have good record-keeping; and that refunds via bank wire transfers took longer due to the dollar amount or a mix-up with the routing number.

63.     For example, in a string of July 2022 emails with a customer ("Customer D"), who purchased over $600,000 of precious metals, and his attorney, who were inquiring about why Customer D's metals had not shown up in his account, Donoso placed the blame on the depository:

> The Vault was told Friday to get everything keyed in immediately. I received a response "We are doing everything possible to process your request" that was early this morning.  I hope and pray that these will be keyed in his account by late tomorrow.  A lot of people are involved with making sure this happens.  If I have to fly in person and stand infront [sic] of someone to see that this is done, I will."

64.     At the time Donoso made these statements, she knew that the precious metals were not appearing in Customer D's account because Defendants had not purchased them but rather misappropriated Customer D's funds.

65.     As another example, in or around early December 2021, a customer ("Customer E"), via their SDIRA custodian, sent Regal Assets approximately $499,000 for the purchase of precious metals.  In or around March 7, 2022, Customer E inquired about the status of her metals which were not showing up in her account.  Donoso responded in an email to Customer E that "[y]ou will see the updates occur

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

this week online.  I spoke with DDSC (the vault last Tuesday) I conformed [sic] they received packages. I was told they will have them inventoried in this week."

66.     Later in March 2022, having not received any "updates," Customer E contacted Donoso again about the status of her precious metals.  Donoso then told Customer E in an email "I personally went through an audit with [the depository vault] yesterday.  They are going to email over the audit to [the SDIRA custodian] here within 4 hrs.  You should see your metals reflect online here in a day or 2.  I did not know that [the depository vault] was back logged [sic]."

67.     At the time Donoso made these statements, she knew that Defendants had not purchased the precious metals for Customer E.  Defendants did not begin acquiring metals for Customer E's account until late April/early May and, even so, Defendants misappropriated more than $247,000 of Customer E's funds.

68.     Donoso also made false representations to customers and at least one SDIRA custodian in the form of inaccurate, altered, and/or falsified bank records, shipping records, and wholesaler precious metal purchase invoices.

69.     Donoso sent these false records and information to customers and at least one SDIRA custodian to mislead them into believing that Regal Assets had purchased the customers' precious metals, had delivered them to a depository, and/or had attempted to send a refund to customers who had requested one.

70.     For example, on May 11, 2022, in response to an inquiry from two customers (a married couple, "Customer F" and "Customer G") requesting documentation of their precious metals purchases, Donoso emailed Customers F and G:  (i) a purchase update from a wholesaler dated November 5, 2021; (ii) a copy of an April 27, 2022 email sent by Donoso to a depository; and (iii) a "Metals Movement Request Form" filled out by Donoso dated April 26, 2022 requesting the depository to transfer to Customer G's account the metals she had purchased.

71.    Together these documents purported to show that Regal Assets had purchased precious metals matching Customer G's order and that Donoso had subsequently requested the depository to transfer the metals to Customer G's account.

72.    In fact, Donoso had intentionally doctored the email purportedly sent to the depository and the purchase notification from the wholesaler by selectively redacting certain information and adding fictitious information to falsely represent that these records pertained to Customer G's order.  In addition, Donoso never sent the "Metals Movement Request Form" to the depository.

73.    A few days later, Donoso sent the same types of false records to Customer F with respect to his precious metals purchase.

74.    Once Customers F and G realized that their precious metals had not been transferred to their accounts, they demanded a refund, to which Donoso agreed.

75.    On June 10, 2022, Donoso emailed purported wire information, dated the same day, to Customer F's and Customer G's SDIRA custodian purporting to show a refund of over $1.25 million and over $1.35 million to Customer F's and Customer G's SDIRA accounts, respectively.

76.    In reality, Donoso had copied the wire confirmation from an unrelated wire transfer made that day, deleted the amount sent, and typed in the amounts that were owed to Customers F and G, all in an attempt to convince the SDIRA custodian and Customer G that Customer G's funds had been fully refunded when in fact they had not.

77.    Having still not received their funds, on June 13 and June 15, 2022, Customer G contacted Donoso requesting copies of the bank wire confirmations. Donoso responded to Customer G on June 15, 2022 falsely stating "[y]our wire fully released today."

78.    On June 16, 2022, Donoso sent another email to the SDIRA custodian falsely stating that:

> I am on the phone with Bank of America. They are telling me the Fed Trace number I provided you is the correct one for [Customer G].  They have informed me that due to the amount and recent Wire Fraud at BOA they have done due diligence and it can take you guys 2-3 days to receive.  I have only been able to release [Customer G's] wire. They will not let me process [Customer F's] [wire] until tomorrow.

79.     That same day, the SDIRA custodian responded to Donoso:

> We are a bank, so we see the wires as soon as they hit our account.  There is no hold-up on our side on these types of transactions.  I am told that when a[] [wire transfer reference] number is assigned by the Federal Reserve, the wire has been sent through the fed system and delivered to the receiving bank. This makes me believe that the [wire transfer reference] number you provided was not associated with your payment to [Customer F's and Customer G's] accounts through [the SDIRA].

80.     On June 22 and 23, 2022, Customer G's SDIRA account received three wires from Regal Assets' bank account totaling $250,000, which was only a small portion of the total amount owed to Customers F and G.

81.     Then on June 27, 2022, Donoso sent Customers F and G and their SDIRA custodian another document purporting to show a wire transfer ledger from Regal Assets' bank account to Customer F's and Customer G's SDIRA accounts of over $2.3 million.

82.     In reality, the document sent by Donoso was another forgery that she created by manually manipulating unrelated ledger entries from one of Regal Assets' bank accounts.

83.     At the time Defendants sent these communications, Defendants knew that they had misappropriated the funds sent by Customers F and G for the purchase of precious metals, that Regal Assets had never purchased these customers' precious metals, and that Regal Assets did not have the funds to refund these customers' accounts.

### D.     Defendants' Fraudulent Scheme Unravels

84.     By the spring of 2022, an increasing number of customers began contacting Regal Assets to request information as to why the precious metals they purchased had not been credited to their SDIRA accounts.

85.     These inquiries increased in number and frequency after one of the SDIRA custodians reviewed the accounts of its clients who had purchased precious metals from Regal Assets and discovered that many of these accounts had never received their metals.

86.     The SDIRA custodian subsequently sent letters to its clients notifying them that the SDIRA custodian had not received confirmation that the clients' precious metals had been delivered to the depository.

87.     Customers also began to have increased difficulty communicating with Defendants.

88.     In August 2022, Gallagher terminated Donoso.  Soon after, most of the other Regal Assets employees and agents resigned or were terminated.

89.     In or around late September, Donoso—at Gallagher's request—assisted with responding to customer communications and handling issues associated with customer accounts for one to two months, after which she permanently departed from Regal Assets.

90.     In late 2022, Regal Assets ceased accepting calls or communicating with customers.

91.     As of November 30, 2022, the Regal Assets bank accounts had a combined negative balance of approximately $413.

92.     On information and belief, Gallagher left the United States in or around the fall of 2022.

### E.  Gallagher Acted as a Controlling Person of Regal Assets

93.  During the Relevant Period, Gallagher owned at least a 90% share of Regal Assets and served as Regal Assets' CEO.  Upon information and belief, for a period of time another individual owned a 10% share of Regal Assets.  However, upon information and belief, this individual was not involved in the fraud and did not play a significant role in Regal Assets' day-to-day operations.

94.  Gallagher was a signatory on all Regal Assets' bank accounts.

95.  Gallagher had discretion to take distributions from Regal Assets, and Regal Assets directly paid some of his personal expenses as well as expenses associated with Gallagher's other businesses.

96.  Gallagher was responsible for hiring Regal Assets staff (including Donoso), Regal Assets sales representatives, and other Regal Assets employees.

97.  Gallagher did not act in good faith or knowingly induced Regal Assets' fraudulent acts.

### F.  Gallagher, Donoso, and other Regal Assets Employees Were Agents of Regal Assets

98.  The actions taken by Gallagher, Donoso, and all other Regal Assets employees and representatives, as described herein, were performed within the scope of their employment or office with Regal Assets.  As such, Gallagher, Donoso, and other Regal Assets employees and representatives were acting as agents of Regal Assets.

### G.  Allegations Specific to Claims Brought by the State of California:  Defendants Engaged in Unlawful Commodities Transactions and Commodities Fraud

99.  During the Relevant Period, Regal Assets, by and through its agents, operated a website at https://www.regalassets.com/.  The website allowed customers to view and read about various precious metals products they could buy from Regal Assets.  Regal Assets invited potential customers to request a free copy of its

"Investor's Kit" which explained the benefits of investing in precious metals and choosing Regal Assets. The website's "Contact Us" page gave prospective customers the option to communicate with Regal Assets by phone (1-877-962-1133), chat, or via mail to its corporate headquarters in Beverly Hills, California.

100.   Defendants communicated directly and by and through Regal Assets agents with California customers and customers from other states by phone and email. For example, Regal Assets sales agents based in the Los Angeles area called and emailed prospective customers to discuss a customer's interest in purchasing precious metals and to provide the prospective customer with information on the process and the benefits of converting their existing retirement holdings to precious metals.

101.   As another example, in April 2022, when a California customer ("California Customer 1") contacted Donoso to address concerns about a prior precious metals purchase, Donoso sent text messages to reassure the customer. Donoso also confirmed that California Customer 1's retirement account rollover funds would be available to purchase metals soon. Donoso asked California Customer 1 about the customer's interest in making a subsequent precious metals purchase with those funds. California Customer 1 confirmed interest in the precious metals Donoso mentioned as well as a few others. The following day on April 12, 2022, Donoso sent California Customer 1 a text message with an update that a Regal Assets sales agent would call the customer that morning with price information.

102.   On or about April 12, 2022, a Regal Assets sales agent sent California Customer 1 a purchase confirmation email informing the customer that Regal Assets had "locked up" and "secured" the precious metals for the customer at the agreed-upon price, quantity, and type. The April 12 confirmation also informed California Customer 1, that "[a]s soon as your account is fully funded [your precious metals] will be moved from inventory vaults to full inspections before shipping to [the

depository]." California Customer 1 sent Regal Assets over $100,000 to purchase precious metals.

103. During the Relevant Period, neither Defendants nor their agents were financial institutions, registered broker dealers, insurance companies, financial holding companies, or investment bank holding companies, and neither Gallagher nor Donoso was an associated person of such entities.

104. Defendants did not inform customers, including but not limited to, California Customer 1, that:

     i. Defendants misappropriated Regal Assets customer funds to pay for, among other things, Defendants' personal expenses and bonus payments.

     ii. Defendants relied on loan proceeds and new customer funds to make precious metals purchases to satisfy customer accounts.

     iii. Regal Assets used customer funds to pay down the balances of its loans.

     iv. Defendants provided false and misleading information to customers about the status of customers' precious metals purchases.

105. The conduct and practices discussed in Paragraphs 1 to 104 violate California state law prohibiting unlawful commodities transactions as well as schemes to defraud and material misrepresentations or omissions in connection with the offer, purchase, or sale of commodities.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS
*(Brought by All Plaintiffs)*

## <u>COUNT 1</u>
### Fraud
### Violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022)

106.   The allegations in Paragraphs 1 through 105 are re-alleged and incorporated herein by reference.

107.   The conduct described above occurred in connection with contracts of sale of commodities in interstate commerce.

108.   7 U.S.C. § 9(1) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

109.   17 C.F.R § 180.1(a) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1)     Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2)     Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3)     Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

110.   Defendants, directly or indirectly and in connection with contracts of sale of commodities in interstate commerce, knowingly or recklessly misappropriated customer funds and made material fraudulent misrepresentations and omissions to

1  customers regarding, among other things, Defendants' use of customer funds and the

2  status of customers' precious metal purchases.

3      111.   Defendants, directly or indirectly and in connection with contracts of

4  sale of commodities in interstate commerce, knowingly or recklessly failed to

5  disclose to prospective and existing customers that Defendants misappropriated

6  customer funds.

7      112.   By reason of the conduct described above, Defendants violated 7 U.S.C.

8  § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

9      113.   The foregoing acts, misrepresentations, omissions, and failures of

10  Gallagher, Donoso, and other officers, employees, and agents of Regal Assets

11  occurred within the scope of their employment, agency, or office with Regal Assets.

12  Therefore, Regal Assets is liable for all of these acts and practices pursuant to

13  7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022).

14      114.   During the Relevant Period, Gallagher controlled Regal Assets, directly

15  or indirectly, and did not act in good faith or knowingly induced, directly or

16  indirectly, Regal Assets' violations alleged in this count.  Therefore, Gallagher is

17  liable for Regal Assets' conduct described herein pursuant to Section 13(b) of the

18  CEA, 7 U.S.C. § 13c(b).

19      115.   Each use or employment or attempted use or employment of any

20  manipulative device, scheme, or artifice to defraud; untrue or misleading statement of

21  fact, omission of a material fact necessary to make statements not untrue or

22  misleading; or act of engaging, or attempting to engage, in acts, practices, or courses

23  of business that operated or would have operated as a fraud or deceit on Regal

24  Assets' customers is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and

25  17 C.F.R. § 180.1(a)(1)-(3).

26  **VI.   VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE**

27  *(Brought by Plaintiff California Department of Financial Protection & Innovation)*

28

**COUNT 2**
**Unlawful Commodity Transactions**
**Violations of Cal. Corp. Code § 29520**

116.   The allegations in Paragraphs 1 through 115 are re-alleged and incorporated herein by reference.

117.   California Corporations Code section 29520 provides:

> Except as otherwise provided in Section 29530, 29531, or 29532, no person shall sell or purchase or offer to sell or purchase any commodity under any commodity contract or under any commodity option, or offer to enter into, or enter into, as seller or purchaser any commodity contract or any commodity option.

118.   Under California Commodity Law of 1990 ("CCL") (Cal. Corp. Code, § 29500-29567) sections 29504 and 29515, precious metals are "commodities."

119.   Under CCL section 29505, a "commodity contract" means "any account, agreement, or contract for the purchase or sale, primarily for speculation or investment purposes and not for consumption by the offeree or purchaser . . . ."

120.   California Corporations Code section 29552 provides:

> Any person who materially assists in any violation of this law, or any rule or order of the commissioner under this law, is jointly and severally liable with any other person liable under this law for the violation.

121.   During the Relevant Period, Defendants offered to sell and sold, and offered to purchase and purchased, commodities and entered into commodity contracts in California.  Defendants' commodity transactions fail to qualify under any exceptions or exemptions in violation of CCL section 29520.  By engaging in the conduct set forth above, Defendant Donoso knowingly provided substantial assistance to Defendants Regal Assets and Gallagher in their violations of CCL section 29520.

**COUNT3**

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

## Commodities Fraud
## Violations of Cal. Corp. Code § 29536

122. The allegations in Paragraphs 1 through 121 are re-alleged and incorporated herein by reference.

123. California Corporations Code section 29536 provides:

> It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option to do any of the following:

> (a) To willfully employ any device, scheme, or artifice to defraud.

> (b) To willfully make any false report, enter any false record, make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

> (c) To willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons.

> (d) To willfully misappropriate or convert the funds, security, or property of any other person.

124. CCL section 29536 applies to the transactions, agreements, or contracts Defendants offered and sold.

125. During the Relevant Period, Defendants violated CCL section 29536 by the conduct described in this Complaint.  Defendants willfully omitted and willfully made untrue statements of material facts, misappropriated customer funds, and engaged in fraudulent schemes to defraud in connection with the purchase and sale of, the offer to sell, the offer to purchase, the offer to enter into, and the entry into, commodities and commodity contracts.

# VII.   RELIEF REQUESTED

**WHEREFORE**, the CFTC and the DFPI respectfully request that this Court, as authorized by Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§ 13a-1, 13a-2(1), and pursuant to its own equitable powers:

A.     Find that Defendants violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022);

B.     Find that Defendants violated the laws of California as set forth above;

C.     Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from directly or indirectly engaging in the conduct described above, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) and the laws of California;

D.     Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

   1)   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the CEA, 7 U.S.C. § 1a(40));

   2)   Entering into any transactions involving "commodity interests" (as that term is defined in CFTC Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or precious metals that are commodities, as that term is defined herein, for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3) Having any commodity interests or precious metals that are commodities, as that term is defined herein, traded on any Defendant's behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or precious metals that are commodities, as that term is defined herein;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or precious metals that are commodities, as that term is defined herein;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in CFTC Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

7) Acting as a principal (as that term is defined in CFTC Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9);

8) Selling or purchasing or offering to sell or purchasing any commodity under any commodity contract or under any commodity option, or offering to enter into, or entering into, as seller or purchaser any commodity contract or any commodity option in violation of Corporation Code section 29520; and

9) Employing a device, scheme, or artifice to defraud, making an untrue statement of a material fact, or omitting to state a material fact

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, engaging in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, or misappropriating funds, in connection with the sale or purchase, or offer to sell or purchase, any commodity, commodity contract, or commodity option, in violation of Corporations Code section 29536.

E.    Enter an order directing Defendants as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the CEA or CFTC Regulations or the laws of California, as described herein, including pre-judgment and post-judgment interest;

F.    Enter an order requiring Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

G.    Enter an order directing Defendants to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the customers whose funds were received by Defendants as a result of Defendants' violations of the CEA or CFTC Regulations or the laws of California as described herein;

H.    Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1), as adjusted for

inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* CFTC Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the CEA or CFTC Regulations, and ordering Defendants to pay civil monetary penalties and/or damages pursuant to the laws of California, during the Relevant Period, described herein;

I.  Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) and the laws of California; and

J.  Enter an order providing such other and further relief as the Court deems proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: September 27, 2023     Respectfully submitted,

COMMODITY FUTURES
TRADING COMMISSION

By: /s/ James Holl

JAMES HOLL
California Bar No. 177885
jholl@cftc.gov
(202) 418-5311

RISHI K. GUPTA, *pro hac vice pending*
(Attorney-in-Charge)
MA Bar No. 663782
rgupta@cftc.gov
(202) 418-6773

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

DANIEL C. JORDAN, *pro hac vice pending*
VA Bar No. 36382
djordan@cftc.gov
(202) 418-5339

BRENDAN M. FORBES, *pro hac vice
pending*
DC Bar No. 1027275
bforbes@cftc.gov
(202) 418-5212

Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, DC 20581

FOR THE STATE OF CALIFORNIA

By: /s/ Denise Smith

CLOTHILDE V. HEWLETT
Commissioner

MARY ANN SMITH
Deputy Commissioner

BORYANA ARSOVA
Assistant Chief Counsel

DANIELLE A. STOUMBOS
California Bar No. 264784
Telephone: (213) 503-2046
Danielle.Stoumbos@dfpi.ca.gov

DENISE SMITH
California Bar No. 309225
Telephone: (415) 966-5985
Denise.Smith@dfpi.ca.gov

- 30 -
COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Plaintiff
STATE OF CALIFORNIA
DEPARTMENT OF FINANCIAL
PROTECTION AND INNOVATION
320 West Fourth Street, Suite 750
Los Angeles, California 90013

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF